JOSEPH DORSEY et al., Suing on Behalf of Themselves and All Others Similarly Situated, Plaintiffs, *v.* STUYVESANT TOWN CORPORATION et al., Defendants.

Supreme Court, Special Term, New York County, July 28, 1947.

*Will Maslow, Thurston Marshall, Joseph B. Robinson, Stanley M. Resner* and *Charles Abrams* for plaintiffs.

*Samuel Seabury, George Trosk, Jeremiah M. Evarts* and *Churchill Rodgers* for defendants.

BENVENGA, J. This is a motion for an injunction *pendente lite* in an action to enjoin defendants from " refusing, withholding from, or denying to any of the plaintiffs or any others similarly situated " any of the apartments in the housing project known as Stuyvesant Town " because of the race or color of said person or persons."

Stuyvesant Town is a housing development in process of construction by Stuyvesant Town Corporation (hereinafter referred to as " Stuyvesant ") in an area running from East 14th Street to East 20th Street, and from First Avenue to Avenue C and the East River Drive of the city of New York. The total cost of the land and buildings constituting the project, it has been estimated, is in excess of $90,000,000, all of which is to be supplied to Stuyvesant by the Metropolitan Life Insurance Company (hereinafter referred to as " Metropolitan ") from funds held for the benefit of its policyholders. When completed, Stuyvesant Town will consist of thirty-five buildings containing 8,755 apartments and housing about 24,000 persons. Moderate rentals are to be charged.

Stuyvesant Town is being constructed and erected under a contract entered into in June, 1943, between the city and the defendants pursuant to the provisions of the Redevelopment Companies Law (L. 1942, ch. 845, as amd.; hereinafter referred to as the " Redevelopment Law "), enacted to implement article XVIII of the State Constitution (hereinafter referred to as the " Housing Article "), adopted by the people in 1938. The

constitutionality of the Redevelopment Law was sustained in *Matter of Murray* v. *La Guardia* (180 Misc. 760, affd. 266 App. Div. 912, affd. 291 N. Y. 320, certiorari denied 321 U. S. 771). Subsequently, in *Pratt* v. *La Guardia* (182 Misc. 462, affd. 268 App. Div. 973, appeal dismissed 294 N. Y. 842), a similar motion for a temporary injunction was denied on the ground that it was premature. The issue is now clearly drawn, and both parties press for a decision on the merits.

The question presented is whether the defendants, in the management and operation of Stuyvesant Town, may select tenants of its own choice and, more particularly, whether, in the process of selection, it may refuse housing accommodations to plaintiffs and others similarly situated because of race, color, creed or religion.

(1) It is well settled that the landlord of a private apartment or dwelling house may, without violating any provision of the Federal and State Constitutions, select tenants of its own choice even though it may result in the exclusion of prospective tenants because of race, color, creed or religion (*Corrigan* v. *Buckley,* 271 U. S. 323, 330; *Kemp* v. *Rubin,* 188 Misc. 310; *Ridgway* v. *Cockburn,* 163 Misc. 511; *Dury* v. *Neely,* 69 N. Y. S. 2d 677).

These principles were recently applied in *Kemp* v. *Rubin* (*supra*). That case involved the constitutional validity of a restrictive covenant prohibiting the disposal of real property to Negroes during a specified period. Distinguished counsel, including counsel for plaintiffs herein, urged among other grounds that the use of such covenants was prohibited by the civil rights article of the State Constitution (art. I, § 11). This article was adopted by the people in 1938, when the housing article was adopted. The civil rights article, so far as material, provides: " No person shall, because of race, color, creed or religion, be subjected to any discrimination *in his civil rights* by any person or by any firm, corporation, or institution, or by the state or any agency or subdivision of the state." (Italics supplied.)

Ruling against counsel's contention, LIVINGSTON, J., in a well-considered opinion said (p. 314): " In the debates which preceded the adoption of the amendment (Revised Record of the New York State Constitutional Convention, 1938, Vol. 4, pp. 2626–2627), it was stated that the civil rights concerning which the amendment was designed to afford protection were only those ' which appertain to a person by virtue of his citizenship in a state or a community ', and ' which are found in the Constitution, in the Civil Rights Law and in the statutes.' In

other words, no new civil rights were intended to be created by the constitutional amendment and it was merely permissive in character. This interpretation is reinforced by the statement of the Bill of Rights Committee (Revised Record of the New York State Constitutional Convention, 1938, Vol. 2, p. 1144) which reads: '* * * it is implicit in the Constitution that any * * * enactment such as this, in order to be effective, must be carried out in some form by legislative enactment * * *.' * * * It seems clear, therefore, that we do not have on our statute books any specific provision which outlaws racial restrictive covenants.''

As LIVINGSTON, J., points out in *Kemp* v. *Rubin* (*supra*), and as SHIENTAG, J., points out in *Pratt* v. *La Guardia* (*supra*, p. 468), the State Constitution contains no provision against discrimination in housing, although unsuccessful attempts were made to insert such a provision in the civil rights article, the housing article and other articles of the Constitution when it was being considered by the Constitutional Convention of 1938 (see Convention Pr. Nos. 10, 18, 49, 203, 380, 625, 691). In the light of these cases, therefore, a rather narrow question is here presented; that is, whether our statute contains any specific provision against discrimination in housing on the ground of race, color, creed or religion.

In this connection, it is to be noted that, not only were unsuccessful attempts made to insert an anti-discrimination provision in the Constitution during the 1938 Constitutional Convention, but equally unsuccessful efforts were thereafter made to amend the Redevelopment Law and the Civil Rights Law so as to so provide (see 1944 Assem. Pr. Nos. 29, 416, 1321, 1469, 1996; 1945 Assem. Pr. Nos. 176, 341; see, also, 1945 Assem. Pr. No. 1885; 1947 Assem. Pr. No. 34; *Kemp* v. *Rubin, supra,* p. 314).

However, while attempts to insert anti-discrimination provisions in the Constitution and in the Redevelopment Law and the Civil Rights Law proved unavailing, such efforts were successful so far as they concerned the Public Housing Law and the Administrative Code of the City of New York.

Thus, section 223 of the Public Housing Law (L. 1939, ch. 808) prohibits discrimination because of race, color, creed or religion in low-rent housing projects erected pursuant to the provisions of that law. But in this connection it is to be noted that, while a city or public corporation may engage in " building and operation of low rent * * * houses for persons of low income as defined by law " (i.e., Public Housing Law), they **may not** engage " in any private business or enterprise other

than the building and operation '' of such low-rent dwelling houses (N. Y. Const., art. XVIII, § 10). Admittedly, therefore, Stuyvesant Town is not such a project, and section 223 does not apply. If that be so, then it would seem to strengthen the argument that Stuyvesant, or any other corporation engaged in redeveloping and rehabilitating substandard and insanitary areas under the Redevelopment Law, is a company engaged in a '' private business or enterprise.''

So, section J41–1.2 of the New York City Administrative Code, adopted in July, 1944, prohibits the granting of tax exemption on the project of any housing company, redevelopment company or redevelopment corporation which shall discriminate against tenants on account of race, color or creed, '' other than a project hitherto agreed upon or contracted for ''. The project herein involved was agreed upon and contracted for in June, 1943. Admittedly, therefore, section J41–1.2 is inapplicable.

Clearly, therefore, housing accommodation is not a recognized civil right. It is neither a violation of any provision of the Federal and State Constitutions to refuse such accommodations on the ground of race, color, creed or religion; nor is it a violation of any statutory provision applicable to Stuyvesant Town.

(2) Apparently recognizing this, plaintiffs contend that while discrimination in housing is not expressly prohibited by the Redevelopment Law, it is impliedly prohibited thereby. Plaintiffs argue that, though Stuyvesant is not a public corporation, and though Stuyvesant Town is not a public housing project within the meaning of the Public Housing Law, nevertheless since private property for the project was acquired by eminent domain and since defendants are entitled to partial tax exemption, Stuyvesant is a '' repository of official power '' and the project is in the nature of a '' public undertaking '' and so subject to the same limitations which are applicable to public housing projects. Defendants, on the other hand, insist that Stuyvesant Town is not a public project in any sense of the word; that Stuyvesant is not a governmental agency or a repository of official power, but a private corporation, and, as such, possesses all the usual powers and functions of management of a privately owned apartment building or dwelling house, including the right to select its tenants.

In support of this contention, defendants rely upon the opinion of the Court of Appeals in *Matter of Murray* v. *La Guardia* (291 N. Y. 320, *supra*). In the '' comprehensive

prevailing opinion " of LEWIS, J., in that case — as SHIENTAG, J., pointed out in *Pratt* v. *La Guardia* (*supra,* p. 464) — " the history of the housing amendment to the Constitution, the provisions of the Redevelopment Companies Law, the objects sought to be accomplished thereby, the requirements and reciprocal obligations under the statute and the validity of the proposed project were carefully considered."

Thus, the *Murray* opinion (*supra*) points out that the Housing Article grants to the Legislature authority to provide (1) " for low rent housing for persons of low income as defined by law " (i.e., the Public Housing Law); and (2) " for the clearance, replanning, reconstruction and rehabilitation of substandard and insanitary areas " (pp. 326, 327, 329, 331). The court then holds that Stuyvesant Town " involves the clearance and rehabilitation of a substandard and insanitary area — and not low rent housing for persons of low income " (p. 332). Hence, the provisions of the Public Housing Law are inapplicable.

Speaking of the Redevelopment Law, the court observes that it was designed " to promote co-operation between municipal government and private capital to the end that substandard, insanitary areas in our urban communities may be rehabilitated " (p. 332). And discussing some of the constitutional objections, the court declared that the condemnation of private property authorized by the statute was for " public use " and for " public purposes " (p. 329), and that the statute was not unconstitutional because it " permits the City to exercise the power of eminent domain to accomplish a project, from which the Metropolitan — a private corporation — may ultimately reap a profit "; that, " If, upon completion of the project the public good is enhanced it does not matter that *private* interests may be benefited " (pp. 329–330); that, moreover, the partial tax exemption provisions of the statute " cannot occur until the project itself — the work of redevelopment and rehabilitation within the substandard area — has been completed *and the public purpose for which the project was designed has been accomplished* " (p. 330). (Emphasis supplied.)

(3) True, the Court of Appeals in the *Murray* case (*supra*) did not pass upon the constitutional questions here involved. But it is to be noted that, in discussing the questions there presented, the court did emphasize that the purpose of the statute was to promote co-operation between the city and " private capital "; that the clearance and rehabilitation of a substandard and insanitary area is a " public purpose " and

the condemnation of private property for that purpose is for a " public use "; that the public use and purpose is accomplished when the work of redevelopment and rehabilitation is completed; and that, if upon completion the public good is enhanced, it does not matter that " private interests " may be benefited, or that a private corporation, like Stuyvesant, may ultimately reap the benefit. In other words, it would seem that the court recognized that, eventually, Stuyvesant Town was to be operated and managed in the same fashion as any other " private business or enterprise " (N. Y. Const., art. XVIII, § 10), subject only to the limitations imposed in the matter of rents and profits. That being so, it follows that defendants may exercise the usual powers and functions of an owner of a privately owned and controlled apartment house, and that it may, in managing the property, select its tenants upon any basis which, in its judgment, is most likely to insure the success of the project and the safety of its investment.

The fundamental fallacy in plaintiffs' argument is that it confuses " public use " and " public purpose " with " public project ", and assumes that, because the work of redevelopment and rehabilitation is a public purpose, the project involved is necessarily a public project. But the public use and purpose involved terminates when the work of redevelopment is completed; it does not exist throughout the life of the project and until the area is again ripe for redevelopment and rehabilitation. In a word, though the purpose involved is a public purpose, the project itself is not now and never was a public project.

It may well be that, from a sociological point of view, a policy of exclusion and discrimination on account of race, color, creed or religion is not only undesirable but unwise. But the wisdom of the policy is not for the courts. That was and is a matter for the Legislature. The courts cannot usurp the function of the Legislature by reading into the Redevelopment Law a provision which, on a number of occasions, the Legislature refused to enact into that statute. (See *Matter of O'Brien* v. *Tremaine,* 285 N. Y. 233, 238; *Kemp* v. *Rubin,* 188 Misc. 310, *supra.*)

The motion is accordingly denied.